**Jeremy L. Friedman, CA Bar #142659**
Attorney at Law (*pro hac vice*)
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
jlfried@comcast.net

**Derek C. Johnson, OSB #88234**
Johnson Clifton, Larson & Schaller, P.C.
975 Oak St, Suite 1050
Eugene OR 97401
Telephone: (541) 484-2434
Facsimile: (541) 484-0882
djohnson@jclslaw.com

Attorneys for relator Michael Ray Perry

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **United States of America *ex rel.* Michael Ray Perry**, | Case No.  6:08-cv-6307 HO |
| Plaintiff, | **THIRD AMENDED *QUI TAM* COMPLAINT** |
| vs. | |
| **Hooker Creek Asphalt & Paving, LLC,  Oregon Mainline Paving, LLC, J.C. Compton Contractor, Inc**., **Hap Taylor & Sons, Inc**., **Knife River Corporation – Northwest, and Central Oregon Redi-Mix, LLC,** | **[JURY DEMAND]** |
| Defendants | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

JURISDICTION AND VENUE ......................................................................... 2

THE PARTIES .................................................................................................... 3

FEDERAL-AID HIGHWAY PROGRAM ....................................................... 4

OREGON RECEIVES FEDERAL GRANT FUNDS ...................................... 5

FEDERAL QUALITY CONTROL REQUIREMENTS ................................... 6

OREGON QUALITY CONTROL AND ASSURANCE ................................. 7

CONTRACTOR OBLIGATIONS ..................................................................... 7

CONTRACT DOCUMENTS ............................................................................. 8

RELATOR'S GENERAL ALLEGATIONS ..................................................... 9

INFORMATION IN DEFENDANTS' EXCLUSIVE POSSESSION ........... 11

DEFENDANTS' CONTRACTS ...................................................................... 12

VIOLATIONS ................................................................................................... 14

INDIVIDUAL CLAIMS .................................................................................. 16

    Hooker Creek Asphalt and Paving ....................................................... 16

        South Bend Weigh & Safety Station project (Contract No. 12876) ......... 16

        US 26: Badger Creek-Sidwalter Rd. project (Contract No. 12924) ......... 17

        O'Neil Highway project (Contract No. 12925) ......................................... 18

        Mt. Hood-Chemult project (Contract No. 12990) ..................................... 19

        Willowdale-Antelope project (Contract No. 12994) ................................ 20

        US 26: Laughlin Road to Marks Creek project (Contract No. 13137) ...... 22

        Bend-Sisters Preservation project (Contract No. 13151) ......................... 23

        OR 58: US 97 Overcrossing (Contract No. 13311) .................................. 24

        US 97: China Hat Rd.-Baker Rd./Lava Butte project (Contract No. 13334) 26

        US26: Warm Springs River project (13257) ............................................. 29

    Oregon Mainline Paving, LLC ............................................................. 30

        Redmond Reroute, Unit 1, Phase 2 project (Contract No. 13302) ........... 30

J.C. Compton Contractors ..................................................................... 34

    Biggs-Wasco & Grass Valley project (Contract No. 12907) ................... 34

    Cotton Wood-Freemont project (Contract No.12985) ............................... 36

Hap Taylor/Knife River ....................................................................... 37

    Grandview Dr.-Nels Anderson Place project (Contract No. 12884) ......... 37

    US 97: Riley Bridge Bend project (Contract No. 13032) ....................... 38

    Or 16: Glacier-Highland Couplet project (Contract No. 13072) ............. 39

    US 97/26 Willow Creek-Depot Rd. project (Contract No. 13077) .......... 40

    US 97: Redmond Reroute, Phase 1, Unit 1B (Contract No. 13165) ........ 41

    OR 31: Silver Creek Bridge project (Contract No. 13185) ..................... 42

    US 97 @ S. Century Drive, Sunriver project (Contract No. 13189) ........ 43

    OR 126: Prineville Crooked River Bridge (Contract No. 13200) ............ 44

SPECIFICATIONS AND CONTRACTS ....................................................... 45

ADDITIONAL ALLEGATIONS OF SYSTEMIC VIOLATIONS ................................ 47

DAMAGES ........................................................................................... 50

CLAIM FOR RELIEF ............................................................................... 51

PRAYER .............................................................................................. 53

## INTRODUCTION

1.  This is a *qui tam* action brought by relator Michael Ray Perry ("Perry"), arising out of defendants' violations of the United States False Claims Act, 31 U.S.C. § 3729 *et seq.*  Relator alleges defendants knowingly made false claims, created false records and engaged in fraudulent conduct related to materials and contract performance on federal transportation contracts for the construction and maintenance of Interstates, U.S. Routes, and Oregon Routes within the state of Oregon.   As a result of defendants' False Claims Act violations, the United States has been damaged in the amount of federal funds expended on the projects and contracts through the Federal Aid Highway Program (FAHP), or through appropriations and allocation acts/funds (DOT Appropriations Act 71), administered by the Federal Highway Administration (FHWA).

2.  Relator brings this action in the name of, and on behalf of, the United States government, seeking to recover civil penalties, treble damages, attorneys fees, relator's expenditures, and other relief permitted under the False Claims Act.

3.  This action focuses primarily on false claims for federal funding of surface transportation projects containing substandard and/or defective components.  As alleged herein, defendants knowingly, consistently and systematically failed to conduct appropriate tests on appropriate materials, failed to report inadequate results, doctored test results to appear passing, failed to rework sections of failing materials, allowed substandard failing materials to be used to complete projects, falsely and fraudulently induced contract change orders to cover up failing materials, and failed to use accurately calibrated equipment to achieve accurate test results.  As a result of such conduct, they have made and caused to be made false claims, statements and records, including express and implied false certifications of compliance with contract document requirements. Because compliance with such requirements is a prerequisite for payment on federal projects, submission of billings to the state for purposes of claiming federal funds, with the intent to cause the federal government to pay claims to the state for reimbursement on the contractors' billings, violated the False Claims Act.

4.  This Third Amended Complaint follows upon the Ninth Circuit's Order and Memorandum of March 27, 2014, reversing the district court's dismissal of the Second Amended Complaint and remanding to allow an opportunity to amend.  Herein, Perry narrows the claims asserted, converting allegations of False Claims Act violations that served as representative examples of systemic fraud into individual claims.  *See* ¶¶55 – 153.  Further, he alleges additional facts of systemic False Claims Act violations by these defendants occurring outside ODOT Region, that were not contained in the Second Amended Complaint, and which do not rely exclusively on the pleaded violations as representative examples.  *See*  ¶¶156 – 161.

### JURISDICTION AND VENUE

5.  This Court has jurisdiction pursuant to 31 U.S.C. § 3730, 31 U.S.C. § 3731, 42 U.S.C. § 1988, and 28 U.S.C. § 1331, 1343, 2201 and 2202.

6.  There has been no "public disclosure," as that term is used in 31 U.S.C. § 3730(e)(4)(A), of the allegations or transactions upon which this action is based.  There was no prior public disclosure of the allegations or transactions upon which this action is based in any governmental report, audit, hearing, or investigation, or in the news media.  Relator did not base the allegations of this action upon any such public disclosures.

7.  Although there has been no public disclosure under the Act, relator is an "original source" as that term is used in 31 U.S.C. § 3730(e)(4)(B) of information set out in this Complaint.  Relator had direct and independent knowledge of information important to disclosure of several instances of fraudulent conduct and false statements in connection with defendants' contract compliance.  Prior to the initiation of this *qui tam* action in October 2008, relator voluntarily disclosed his information to state and federal officials, including superiors at Oregon Department of Transportation (ODOT) throughout his employment; (now deceased) state legislator Ben Westlund beginning in December 2005; the Fraud Division of the Oregon Secretary of State beginning in January 2006; the Federal Bureau of Investigation beginning in March of 2007; and the Department of Justice in February of 2005 and on dates subsequent to January, 2008.

8.  Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because defendants have offices, can be found, and transact business here, and because some of the acts complained of took place in this district.

## THE PARTIES

9.  Relator **Michael Ray Perry** was at all material times a natural person residing in the State of Oregon.  Perry was employed by ODOT in Region 4, Bend, Oregon, from 1983 until January 2008, when his employment was terminated by ODOT.  Since 1996, Perry has held positions integrally involved in ensuring contract compliance.

10.  Defendant **Hooker Creek Asphalt & Paving, LLC** ("Hooker Creek") is an Oregon limited liability corporation engaged in the business of road construction and hired by ODOT to perform work on federal road construction and repair projects.

11.  Defendant **Oregon Mainline Paving, LLC** ("Oregon Mainline") is an Oregon limited liability corporation engaged in the business of road construction and hired by ODOT to perform work on federal road construction and repair projects.

12.  Defendant **J.C. Compton Contractor, Inc.** ("J.C. Compton") is an Oregon corporation engaged in the business of road construction and hired by ODOT to perform work on federal road construction and repair projects.

13.  Defendant **Hap Taylor& Sons, Inc.**, was at relevant times herein an Oregon corporation engaged in the business of road construction and hired by ODOT to perform work on federal road construction and repair projects.  It is now an assumed business name after merging with Knife River Corporation, Northwest, effective Dec. 31, 2009.

14.  Defendant **Knife River Corporation – Northwest,** is an Oregon corporation which has merged with defendant Hap Taylor & Sons and continues to operate that business under the assumed name of Hap Taylor & Sons.

15.  Defendant **Central Oregon Redi-Mix, LLC** is an Oregon limited liability company registered by Knife River Corporation on June 11, 1998.  During the relevant time period, defendant Central Oregon Redi-Mix was hired by ODOT to perform work on federal road construction and repair projects in partnership with Hap Taylor & Sons., Inc.

16.  As used herein, defendants Hap Taylor & Sons, Knife River Corp. - Northwest and Central Oregon Redi-Mix are collectively referred to herein as "Hap Taylor."

## FEDERAL-AID HIGHWAY PROGRAM

17.  FAHP is administered by FHWA, part of the United States Department of Transportation (USDOT).  FAHP provides federal reimbursement for construction costs incurred by the state in the construction and improvement of the National Highway System, urban and rural roads, and bridges.   In order to be eligible to participate in FHWA-funded projects, states must comply with federal project approval and oversight, including the submission of plans, specification and estimates (23 U.S.C. §106).

18.  By statutory mandate (23 U.S.C. §109), Secretary of the USDOT must ensure plans and specifications so each proposed highway project is constructed in accordance with criteria best suited to accomplish safety and durability.  This federal law requires implementation of  construction standards approved by the Secretary in cooperation with the State transportation departments adequate to enable highway projects to accommodate the types and volumes of traffic anticipated for such project for a twenty-year period.

19.  Pursuant to this statutory mandate, FHWA has adopted express regulatory requirements governing the responsibilities of the states, contractors and recipients of FAHP funds.  These include design standards for highways (23 C.F.R. Part 625); requirements for maintaining of records and reporting of materials and supplies used on federal highway projects (23 C.F.R. §633.101); contract procedures to be followed as a condition of federal eligibility (23 C.F.R. Part 635, Subpart A); procedures relating to product and material selection and use (Subpart D); proscription against "false statement, false representation, false report or false claim with respect to the character, quality, quantity, or cost of any work performed or to be performed, or materials furnished or to be furnished" (23 C.F.R. §635.119); and inspection and approval requirements including extensive quality assurance procedures (23 C.F.R. Part 637, Subpart B) and a certification of compliance with sampling and testing requirements (Appendix A to Subpart B).

20.  Funding for FAHP begins when Congress develops and enacts surface transportation authorizing legislation.  Through such appropriations, federal funds are made available to the Secretary of USDOT and FWHA for highway construction programs.  These funds are held in a general fund or the Highway Trust Fund.

21.  FAHP is a reimbursement program.  The United States does not apportion cash to States.  Instead, states are notified of a balance of Federal funds available for their use on federally-eligible construction projects.  Under FAHP, States incur obligations, begin projects, and then file claims with the federal Treasury to obtain FHWA approval for payment of federal share reimbursement of eligible costs incurred and claimed.

## OREGON RECEIVES FEDERAL GRANT FUNDS

22.  Since at least as early as 1997, Oregon has entered into agreements with FHWA for work on FAHP projects throughout the state.  Subsequent to the approval of the projects, the state has followed the ordinary sequence of events in order to claim federal funds.  These have included:

    a.    Work on highway construction projects is performed by contractors;

    b.    Contractors submit bills to the State, which processes bills for work throughout the state;

    c.    Vouchers for the bills are presented to FHWA for review and approval;

    d.    FHWA certifies the State's claim for payment;

    e.    Certified schedules are submitted to the Treasury Department;

    f.    Treasury transfers the federal share of costs for all projects on the vouchers as reimbursement to the State.

23.  Since at least as early as 2000, defendants have entered into contracts with ODOT to work on federal highway construction projects, they have performed work on those contacts and have otherwise submitted bills to ODOT for the work claimed to have been performed on federally-eligible projects. Defendants' submission of bills are the necessary starting point by which the state claims federal funds, and the bills and records are submitted by defendants with the intention to cause the state to present vouchers and

certified schedules to the federal Government for purposes of obtaining federal funds. Claims, statements and reports by contractors of work performed and material provided on FAHP projects are a direct causal factor in the payment of FAHP claims to the state.

24.   Once an obligation to reimburse a cost of a highway project is made, the Federal government must reimburse the States when bills become due.  An obligation is the Federal Government's commitment to pay its share of project costs.  Federal shares are specified in authorizing legislation, but most projects receive an 80% Federal share, where the difference is matched by State and local money.  Federal shares for interstate systems and Federal Lands Highway projects usually range from 90% to 100% of costs.

25.   Although the federal government funds most of the costs for each project, the Government allocates to the State's highway department the decision-making power in matters related to contracts and agreements for highway construction.  Such an allocation is predicated on the State's agreement with the Government to comply with federal law and regulations, and submit for audit and review by the Federal Highway Administrator.

### FEDERAL QUALITY CONTROL REQUIREMENTS

26.   Federal regulations require States to implement policies and procedures designed to assure the quality of highway construction projects.  Title 23 of the Code of Federal Regulations pertaining to highways prescribes policies, procedures and guidelines for highway construction to assure the quality of materials and construction in all FAHP projects in the National Highway System. 23 C.F.R. § 637.201.

27. Section 637.205 required ODOT to develop a quality assurance program so that materials and workmanship incorporated into each Federal-aid highway construction project on the national highway system is in conformity with the requirements of the approved plans and specifications.

28.   Pursuant to § 637.207, ODOT's quality assurance program was required to provide for an acceptance program and an independent assurance program.

a.      The acceptance program must consist of: (A) frequency guide schedules for verification sampling and testing; (B) identification of the specific location

in the construction project where verification sampling and testing is to be accomplished; (C) identification of the specific attributes to be inspected which reflect the quality of the finished product.

b.    The independent assurance program evaluates the qualified sampling and testing personnel and the testing equipment. The testing equipment is evaluated by calibration checks, split samples, or proficiency samples. 23 C.F.R. §637.207(a)(2)(I).

### OREGON QUALITY CONTROL AND ASSURANCE

29. Pursuant to 23 C.F.R. 630.112, Oregon accepted and agreed to comply with the applicable terms and conditions set forth in Title 23 and FHWA regulations, the policies and procedures promulgated by FHWA relative to the designated project, and all other applicable Federal laws and regulations. For Oregon to be reimbursed federal funds for construction and maintenance of surface transportation, ODOT and its contractors must follow these Federal and State policies, procedures, and guidelines. Contractors engaged in federally-funded highway construction projects, as a condition of receiving payment, must adhere to contract obligations set forth in contract documents.

30. Pursuant to Federal obligations, ODOT administers a system for monitoring and verifying contractors' efforts at quality control through a Quality Assurance program. ODOT's quality assurance program consists of three separate and distinct sub-programs: Quality Control, involving the contractor's own operational techniques and activities performed or conducted in order to meet contract requirements; Verification, whereby ODOT performs sampling and testing to validate the quality of the product; and Independent Assurance, intended to provide an unbiased and independent evaluation of all the sampling and testing procedures used in the acceptance program.

### CONTRACTOR OBLIGATIONS

31. Although the State sets these standards and specifications, and implements its own quality assurance program, private contractors are ultimately responsible for quality control. ODOT's quality assurance monitoring is sporadic. It has limited field resources

in relation to the contract work, and it does not detect all non-compliance or take effective remedial steps on all occasions when non-compliance is found.  ODOT's limitations in enforcement of quality assurance do not relieve contractors of quality control obligations.

32.  Contractors are required to employ well-trained certified technicians to perform field-testing of materials for quality control, including certified technicians for aggregate, asphalt, embankment and base, density, mix design, concrete control, concrete strength testing, and quality control.   To validate compliance with the specifications, technicians are required to have plans and specifications on site, inspect materials, conduct required sampling tests, monitor activities and performance, perform analysis and make or recommend changes or adjustments, verify the accuracy of materials data, and submit written reports.  Contractor quality control technicians must notify the contractor and the Engineer immediately when materials are not compliant with specifications.

33.  Project Managers are delegated authority and responsibility to enforce contract provisions.  Contractors submit quality control documentation and records to Project Managers, who rely upon such documentation to oversee the Quality Control Compliance Specialist, to ensure that the project meets requirements specified in the contract and that all required tests are performed, documented and submitted.  Program Managers rely upon each contractor's submissions to ensure quality control requirements are met.

## CONTRACT DOCUMENTS

34.  In Oregon, contract documents include contract specifications, the Manual of Field Test Procedures ("Brown Book"), and standard and supplemental specifications. The Brown Book mandates that all personnel responsible for performing and reporting on tests required on ODOT projects must be certified.

35.  The Brown Book contains quality assurance guidelines and defines the relative oversight responsibilities for quality assurance – setting forth specifications, standards and procedures for the performance of work and quality of products. Certification requirements in the Brown Book apply to all project personnel working as technicians for the State, contractors, or consultants.

36. Oregon also maintains the Oregon Standard Specifications for Construction handbook, known as the "Wine Book." The Wine Book dictates and regulates the quality of materials used in road construction projects in Oregon.

37. Section 00165 - Quality of Materials - prohibits the use of materials that do not conform to approved specifications as set by the Engineer. The specifications for field tested and non-field tested materials are set out in the Brown Book. Materials that are not field-tested can be found in the Nonfield Tested Materials Acceptance Guide.

38. Under ODOT's contract documents, contractors are required to do the following: furnish a written quality control plan; furnish and use materials of the specified quality; provide ODOT approved technicians and laboratories; perform quality control of all materials used on ODOT construction projects; sample and test materials using appropriate devices and procedures; perform all required testing and provide true and accurate results to ODOT for verification; document and sign all test results as required on ODOT forms; and retain testing samples until the Project Manager authorizes release.

## RELATOR'S GENERAL ALLEGATIONS

39. In roadway construction, it is crucial that the foundation is structurally sound, having met minimum construction specification requirements. It is further critical that the incremental addition of layers of subsequent materials also meets the minimum construction specification requirements. Failure to follow this step-by-step, bottom to top process renders the foundation unable to support subsequent layers in a manner which allows for maximum longevity of the wearing surface. These materials are life limited, and failure to meet specifications in the orderly construction process greatly diminishes the time frame in which they break down, causing roadways to fail prematurely.

40. Foundation soundness is dependent on two equally important elements. The first element is the materials, including soil, aggregate, pavement, concrete, and asphalt. The second element is the consolidation of materials, which requires materials to be layered and compacted to a minimum construction specification requirement. Specifications for requirements such as force, temperature control, binder additives,

compactor size, and minimum coverage are all outlined in the contract documents, with state and federal regulations applying to each project.

41. Incremental steps are crucial to the road construction process. If the base levels fail specification, subsequent levels of construction will also experience failure. In essence, without a proper foundation, the entire project is in jeopardy of failure.

42. From May 1999 until his termination in January 2008, Perry held the position of Assistant Quality Assurance Coordinator (QAC), with the following responsibility to test construction materials; evaluate test results for compliance with specifications; maintain records of received material samples and test results; conduct research studies on materials; assign and review work; compute and analyze test results; maintain, repair and calibrate laboratory and field testing machines and equipment; perform nuclear gauge calibration and/or verification of calibration for nuclear moisture-density gauges; observe, monitor, and counsel subordinates in their performance to promote accuracy and adherence to specified procedures; review contractor Quality Control programs including Soils, Aggregate, PCC paving, Structural Concrete, Asphalt, and other highway construction materials; and review and recommend any changes to the QAC regarding contractor requests for changes during production.

43. During the period of time of employment, Relator observed and documented consistent and systematic false statements and fraudulent conduct by contractor defendants with respect to quality control obligations. False statements and fraudulent conduct observed and documented by Relator in a consistent and systemic manner included the following: contractors' failure to conduct appropriate tests on appropriate materials; knowing omission of inadequate results; doctoring of test results to appear passing; failure to rework sections of materials known to be failing; allowance of substandard failing materials to be used to complete projects; obtainment of contract change orders on the basis of false information or to cover up failing materials; and failure to use accurately calibrated equipment to achieve accurate test results.

44.  As a result of the systematic and consistent false statements and fraudulent conduct, Oregon's surface transportation at issue in this case is substandard and defective, and was built in violation of contractually mandated specifications.   Non-compliant materials and shoddy workmanship used on lower levels and employed in previous steps of construction have infected Oregon's roadways and bridges, financed primarily through federal funds.  Such systematic and consistent non-compliance with specifications and contract requirements has left the United States paying for a system of Oregon roads and highways of a substandard character and quality far below the level of workmanship which the Government was entitled to receive.

45.  Roadways are constructed of soils, aggregate, PCC paving, structural concrete, asphalt, and other construction materials (collectively "materials"). Failing, noncompliant materials of the roadway prism (3-D) include, but are not limited to, the following: those used in **roadbeds** (complete excavations and embankment for the sub-grade, including ditches, side slopes, and slopes rounding); **bases** (course of specified material of specified thickness placed below the pavement); **surfacing** (course of material on the traveled way, auxiliary lanes, shoulders, or parking areas for vehicle use); and **bridges** (a single or multiple span structure, including supports that carry vehicles, pedestrians, or utilities on a roadway, walk or track over a watercourse, highway, railroad or other feature).

### INFORMATION IN DEFENDANTS' EXCLUSIVE POSSESSION

46.  Much factual information, records, and practices related to these allegations are in the exclusive possession of defendants, the State and the federal Government.

47.  Relator does not have access to the information, records and practices underlying defendants' bills for work performed and materials provided relating to road construction and maintenance contracts at issue in this lawsuit.  Such information is in the exclusive possession or control of defendants and/or the United States.

48. Each allegation herein is made upon information and belief and identifies a fact regarding which Relator has, based upon his personal knowledge and experience working for ODOT for 25 years, a reasoned basis to allege, but lacks complete detail.

## DEFENDANTS' CONTRACTS

49.  Since at least 2000, defendants have entered into contracts and subcontracts to perform work on federally-funded projects, for the purpose of obtaining federal funds though the cost-reimbursement process administered by the state.   The following list of contracts and projects constituting the individual claims presented, including the contract number, the project name (which identifies the location where the work by each defendant was performed), the award date (which is the date that the contractor was sent a letter informing it that its bid had been approved), the contract amount that the contractor had claimed on the project, and the Third Note date (which is the date that the contractor has completed all work including cleanup, removal of equipment and material, and has submitted all required documentation).

| Contract | Project Name | Award Date | Performed to Date | Third Note |
|---|---|---|---|---|
| **Hooker Creek** | | | | |
| 12876 | South Bend | 07/14/03 | $1,547,656.94 | 07-Jun-06 |
| 12924 | US26: Badger Cr./Sidwalter | 11/06/03 | $1,605,850.77 | 31-Oct-05 |
| 12925 | O'Neil Highway | 11/18/03 | $2,898,382.87 | 18-Jan-06 |
| 12990 | Mt. Hood-Chemult project – subcontract with Wildish Standard Paving | | | |
| 12994 | Willowdale-Antelope project – subcontract w/ Carter & Co. | | | |
| 13137 | US26: Laughlin/Marks Cr. | 05/13/05 | $3,059,753.98 | 26-Sep-06 |
| 13151 | Bend & Sisters Preservation | 06/08/05 | $2,791,742.58 | 11-Apr-07 |
| 13311 | OR 58: US 97 Overcrossing – subcontract w/ MJ Hughes | | | |
| 13334 | US97: China Hat/Baker/Lava | 03/09/07 | $4,675,231.90 | 21-Aug-08 |
| 13257 | US26: Warm Springs River | 05/30/06 | $3,016,033.13 | 17-Oct-07 |
| **J.C. Compton** | | | | |
| 12907 | Biggs/Wasco & G.V./Shaniko | 10/30/03 | $5,360,628.59 | 09-Feb-07 |
| 12985 | US97: Cottonwood/Fremont | 04/07/04 | $4,178,178.08 | 24-Feb-06 |
| **Oregon Mainline** | | | | |
| 13302 | US97 Redmond Reroute 1 | 12/05/06 | $31,402,366.00 | 24-Nov-09 |

| Contract | Project Name | Award Date | Performed to Date | Third Note |
|----------|--------------|------------|-------------------|------------|
| **Knife River** | | | | |
| 12884 | Grandview/Nels Anderson | 08/08/03 | $1,172,134.76 | 24-Jun-05 |
| 13032 | US97: Riley Bridge (Bend) | 08/13/04 | $167,102.20 | 17-Jan-06 |
| 13072 | OR126: Glacier-Highland | 12/22/04 | $9,814,153.68 | 09-Jul-09 |
| 13077 | US97/26: Willow Cr. Br./Dep. | 12/22/04 | $4,616,545.60 | 20-Oct-06 |
| 13165 | US97: Redmond Reroute 1 | 07/06/05 | $6,161,626.54 | 29-Feb-08 |
| 13185 | OR 31: Silver Creek Bridge project  – subcontract w/Steve Coats Const. | | | |
| 13189 | US97 S. Century Dr./Sunriver | 12/06/05 | $9,256,219.10 | 26-Aug-08 |
| 13200 | OR 126: Prineville Crooked River Bridge– subcontract w/JAL Construction | | | |

50.   Since at least 2000, defendants have claimed money on these and other federally-funded projects and caused the state to present claims for reimbursement for work performed and materials used on such projects.  On a regular basis, since the time of the award date, up to and subsequent to the Third Note date, defendants made claims, representations, certifications and reports regarding the quality and quantity of the work performed and materials provided.   On a regular basis, subsequent to the presentment of the bills, reports, statements, certifications and claims by the contractors, ODOT has presented vouchers to the United States for payment of funds as reimbursement of the federal share of the amounts paid to defendants on each project.  On a regular basis, each voucher submitted by the state was approved and paid by the federal Treasury based upon the underlying contractors' billings.  Defendants' claims, billings, reports, statements and certifications were material and in fact essential to the process by which claims for federal funds were presented for payment and were paid to the state as reimbursement for funds paid to defendants.

51. Each bill or request seeking payment for work performed on these and other federally-funded project constitutes a "claim," under former §3729(b) ("any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient, if the United States Government provides any

portion of the money ... requested or demanded, or will reimburse such contractor, grantee or other recipient for any portion of the money which is requested or demanded") and current §3729(b)(2) (same, "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest).

## VIOLATIONS

52. Since at least 2000, defendants, and each of them, knowingly, consistently and systematically made false and fraudulent claims and statements in order to obtain FAHP and other federal funds, and to cause such funds to be paid to ODOT in connection with federal highway projects. On each of the projects identified below, at each location and throughout the time period on which defendants claimed to have performed work, projects, defendants, and each of them, knowingly, consistently and systematically billed for work and materials that did not meet material standards and specifications established pursuant to the 20-year safety and durability federal mandate. Said defendants had actual knowledge they were submitting bills for materials and work that did not meet material specifications, and/or acted with deliberate ignorance and reckless disregard as to whether material specifications had been met. Defendants, and each of them, knowingly, consistently and systematically made false implied and express certifications as to the character and quality of the materials provided on their projects, and they each knowingly made false records or otherwise engaged in fraudulent conduct to cause FHWA to pay false claims to ODOT, and to cause ODOT to pay defendants.

53. In addition to the false express and implied certifications of compliance with material specifications, defendants also made affirmative material false statements, created or caused to be created material false records, and engaged in a course of fraudulent conduct, on each of the contracts identified herein and others. Said actions constituted a scheme, policy and pattern of practice, pursuant to which defendants knowingly supplied and used construction, and sought payment for, materials (embankment, aggregate, concrete, and asphalt pavement) which did not meet the ingredient proportions and densities specified by contract documents specifications.

54.  In particular, defendants, and each of them, knowingly, consistently, and systematically made and caused to be made false and misleading statements and certifications on federal highway and bridge contracts by:

a. Failing to conduct and/or report its own Quality Control – pursuant to a duty which itself is a material requirement of regulations and contract specifications.  These required actions would have revealed and disclosed substandard materials and performance on federally funded highway projects;

b. Creating false and misleading records, and engaging in misleading conduct, in connection with its own Quality Control records and reports, in order to hide and cover up non-compliance with material specifications;

c. Making false and misleading representations to ODOT officials responsible for conducting Quality Assurance over federally funded highway projects, in order to evade enforcement of specifications through state mechanisms, and otherwise cover up non-compliance;

d.  Making false statements and engaging in fraudulent conduct with Project Managers on federally funded highway projects, in order to obtain contract change orders to cover up substandard construction materials and efforts, and to otherwise avoid enforcement of contract remedies through state mechanisms.

f.   Colluding and entering into agreements with ODOT personnel, to the effect that defendants would provide highway construction materials which did not comply with material specifications, and ODOT personnel would look the other way, in order to cover up substandard materials and avoid enforcement of contract remedies.

g.  Colluding and entering into agreements with Project Managers and their staff, to the effect that defendants would provide highway construction materials which did not comply with material specifications, and Project Managers would nonetheless approve of contract change orders and contract payments, despite the failure to comply with material specifications and regulations.

## INDIVIDUAL CLAIMS

55. Relator alleges the following facts and circumstances constituting a basis for finding False Claims Act violations on each of the following contracts and projects.

**Hooker Creek Asphalt and Paving.**

**South Bend Weigh & Safety Station project (Contract No. 12876)**

56. Hooker Creek Asphalt and Paving was awarded its bid on the South Bend Weigh & Safety Station project (Contract No. 12876) on July 14, 2003, and it closed out its work on or about June 7, 2006. The project called for the building of a weigh station south of Bend on Highway 97. During the above-referenced dates, defendant submitted bills for highway construction work and materials in violation of specifications for QA Program (Base Aggregate, Subbase, and Shoulders) and Shaping and Compacting. Kris Karpstien was the superintendent on the project.

57. In the Fall of 2003, in approximately October, defendant ignored failed verification tests, including a QV1 density test of base aggregate performed by relator. Hooker Creek knowingly failed to identify all of the failing areas, as required. Defendant falsified its own density verifications in Quality Control records, which falsely showed 100% passing verifications when the project had actually failed three out of five QV tests. Defendant's technicians knowingly reported false test results by selective picking spots for testing, rather than using predetermined test locations; and by testing at an incorrect depth, eight inches instead of six.

58. Hooker Creek also knowingly failed to rework the failed area as required. After being notified of the failed ODOT verification, defendant merely re-rolled over just the failed test spot (approx. 5' x 5'), and it requested another verification test from QA. Subsequent testing showed that verification failed too. Defendant knowingly failed to identify the entire failing area and rework it until it met specifications.

59. After learning of relator's role in disclosing substandard materials, revealing defendant's refusal to retests and rework, and relator's refusal to test the mocked-up location, defendant knowingly colluded and conspired with ODOT personnel, in order to

cause relator to be removed from the project. Such actions were taken, and agreements made, in order to further cover up defendant's failure to provide conforming material, and obtain payment wrongfully on federally funded highway projects.

60. In the same time period, Hooker Creek similarly billed for work and materials in violation of specifications requiring Continuously Reinforced Concrete Pavement. Hooker Creek's first trucks to arrive on the project did not have appropriate aggregate and did not meet fracture specifications. Hooker Creek's QCT knowingly failed to reject the loads, incorporating them into the project. On information and belief, Hooker Creek on the same project also failed to test earthwork according to quantity requirements.

61. Hooker Creek's falsities and fraudulent conduct led directly to the knowing delivery of substandard product. The final top-list of pavement was added in the spring of 2004, but the failing areas never achieved proper compaction. As a result, the failing areas failed again, requiring repairs in the summer of 2006.

**US 26: Badger Creek-Sidwalter Rd. project (Contract No. 12924)**

62. Hooker Creek was awarded its bid on the US 26: Badger Creek-Sidwalter Rd. project (Contract No. 12924) on November 6, 2003. This project entailed building passing lanes on Highway 26, on the Warm Spring Reservation. Hooker Creek completed the project by October 31, 2005. During the three years on the project, Hooker Creek submitted bills for work and materials in violation of specifications for the QA Program involving Earthwork. The Superintendent was Dave McDonald.

63. Between February and July, 2004, Hooker Creek conducted 26 Quality Control tests, despite the 2004 specifications requirement that it conduct 44 such tests. Further, although required to test different locations, Hooker Creek used several tests on the exact same area. In addition, the Quality Control Technician knowingly failed to perform sufficient testing of the amount of materials.

64. On the same project, during the same time period, Hooker Creek billed for materials in violation of specifications for HMAC Production QC/QA and it submitted false test results reflecting passing volumetrics. For example, voids failed (reporting

2.9 when allowable tolerance was 3.5 to 5.5); and FVA failed (reporting 81, when allowable tolerance is 65 to 75).

**O'Neil Highway project (Contract No. 12925)**

65.  Hooker Creek was awarded a contract bid on the O'Neil Highway project (Contract No. 12925) on or about November 18, 2003.  This was a pavement over-lay project on the O'Neil Highway, between Redmond and Prineville. Between the time of the award and the project completion January 18, 2006, Hooker Creek submitted bills for work and materials in violation of specifications concerning HMAC Production QC/QA. Mark Roberts was the Superintendent.

66.  In July and August of 2004, Hooker Creek created and submitted false test results purporting to show passing compaction and volumetrics.  At that time, materials provided had excessively high compaction numbers and failed volumetric properties. These included the following specification requirements.  Each specification, taken by itself and considered in conjunction with the other specifications, was adopted pursuant to the 20-year federal mandate for safety and durability, and a material requirement of defendant's contracts.

    a. QV1 , dated 07/26/04, (Nuclear compaction Test Report) shows 3 excessively high readings and one low reading. High readings (96.7%, 95.6% and 97.2%) indicate the volumetric properties are out of specification, requiring Hooker Creek to notify the Project Manager.  TM 306 (notify PM of readings higher than 95%).  On information and belief, Hooker Creek failed to do so.

    b. QV 1 (voids worksheets) failed with a reported 1.1; where allowable tolerance is 3.5 to 5.5.

    c. VFA failed with a reported 91; tolerance is 65 to 75.

    d. Dust-to-oil failed with a reported 1.98; allowable tolerance is 0.80 to 1.60.

    e. QV1, dated 08/05/04,  (Nuclear Compaction Test Report) shows four excessively high readings (96.1%, 96.5%, 94.8%, and an average of 94.6%).  High readings indicate the volumetric properties are out of specification.

f. QV4 (field worksheet) failed specification for the 12.5 (½") sieve with a reported 91; when allowable tolerance is 79-89.

g. QV2, dated 08/23/04, (Nuclear Compaction Test Report) shows 2 excessively high readings (97.3%, with a high average at 95.8%).

h. QV3, dated 08/25/04, (Nuclear Compaction Test Report)shows 2 excessively high readings (96.0% and 95.1% (average of the five numbers)).

I. QV4, dated 08/27/04, (Nuclear Compaction Test Report) shows 2 excessively high readings (96.1% and 95.3% (average of the five readings)).

j. Several verification compaction tests from this time period reflected excessive compaction numbers.

67.  On the same project, Hooker Creek violated standards and specifications for HMAC-Tolerances and Limits, as the product was out of specification on gradation. In addition, on information and belief, Hooker Creek knowingly ceased rolling certain areas of the project so as to avoid high readings on the QC density test reports.

**Mt. Hood-Chemult project (Contract No. 12990)**

68.  Hooker Creek subcontracted with prime contractor Wildish Standard Paving to supply concrete on the Mt. Hood-Chemult project (Contract No. 12990), which began on or about April 27, 2004.  This project involved replacing several bridges between Sandy and Chemult, on Highway 26 and Highway 97, and construction of a 4-lane passing lane.  Between the award date and Third Note date of November 19, 2007, in excess of $33.6 million was expended on this project.

69. By May of 2005, defendant knew or should have known that the work it had performed and materials provided on this project did not comply with material specifications.  Records available to defendant, including its own Quality Control documentation, would show failed batching tolerances.  Failures were also reported in plastic properties, and achieving strength.  These specifications were important to the safety and durability of the entire project, and were therefore a material term of defendant's subcontract.

70. After failure of the concrete to make the contract's required strength, defendant conspired, colluded and agreed with the project manager to issue a Contract Change Order (CCO). Proper procedure requires prior approval for CCOs. In this case, the contractor did not request or receive the CCO, which came with specification changes, until after the QV failed to make strength requirements of 5000 psi on the QV/QC test reports.

71. In addition, defendant and the prime contractor paved over material that failed volumetrics, and submitted false tests reflecting passing volumetrics. Photographs demonstrate the finished roadway exhibited 'flushing' and rutting', and communications from the project manager indicated problems with compaction. On May 1, 2006, relator performed QV3 (HMAC, specification 00745); it was determined to be out of IA parameters on Gmb. On May 3, the QAC performed another TM 326 and AASTHO 166 on ODOT and contractor samples. Results from the subsequent tests were even further away from IA parameters than the original test. After being informed of this, the QAC performed yet another attempt/version of QV3-backup, pursuant to collusion and agreement between defendant and ODOT personnel, in order to shield non-compliance. Such actions illustrate compromising of the QA Program by discounting the validity of the verification (QA) testing.

72. On this project, the Chemult area bridge approaches were paved in the middle of winter, during a snowstorm. This was in violation of temperature specifications and season specifications, leading to the use of non-conforming materials subject to premature failures and public safety risks. The finished roadway exhibited flushing and rutting, indicating substandard construction.

**Willowdale-Antelope project (Contract No. 12994)**

73. Hooker Creek was a subcontractor for a portion of the Willowdale-Antelope project (Contract No. 12994). Carter & Co., Inc. was the prime contractor. This is a bridge replacement on Highway 218, between Willowdale and Antelope. In the Fall of 2004, in approximately November, Hooker Creek knowingly violated specifications for

the QA Program concerning Base Aggregate, Subbase, and Shoulders and for Shaping and Compacting.  With knowledge of the failing materials, Hooker Creek submitted bills for work on the project.

74.    Around the time specified, Hooker Creek knew of failing verifications, or acted with deliberate ignorance and reckless disregard of the failing results of its own Quality Control.  In approximately November 2004, it ignored failures on base aggregate (Specification 00641).  With respect to batching tolerances, no verification tests showed passing results. Moreover, QV1 (Nuclear Compaction Test Report) for base aggregate failed density specification, with a reported 98% compaction.  One hundred percent compaction is required on aggregate base.

75.  Hooker Creek was required to maintain and submit a test summary record in order for it to receive payment under ODOT contracts.  On this project, Hooker Creek failed to report testing information, and it omitted density tests.  Journal notes obtained by relator indicate Hooker Creek's dealing with its density testing, and its failure to provide a base aggregate density curve prior to the performance of the density test.  An appropriate curve is necessary for the proper performance of Quality Control and Quality Assurance, but Hooker Creek knowingly failed to adhere to said requirements.

76.  Although Hooker Creek had a failing verification test on base aggregate, it did not follow program requirements to identify failing areas and re-work and re-test.  Instead, defendant merely paved over failing areas.  Such actions foreclosed on-site verification of specification compliance, and covered up Hooker Creek's non-compliance.

77.  On information and belief, this defendant constructed the concrete bridge on this project, submitting bills thereon, knowingly that did not meet Batching Tolerances.  Compliance with said batching tolerance requirements is necessary for adherence to the 20 year safety and durability mandate of the federal statute.  Batching Tolerance specifications are material to defendant's compliance with contract requirements.

**US 26: Laughlin Road to Marks Creek project (Contract No. 13137)**

78.  Hooker Creek was awarded a bid on the US 26: Laughlin Road to Marks Creek project (Contract No. 13137), on or about May 13, 2005.  This was a paving project from Prineville towards Mitchell for approximately 15 miles on Highway 26.  The project included a small culvert replacement.  Hooker Creek billed over $3 million between the time of the award and the Third Note date of September 26, 2006, for materials in violation of specifications for Concrete Bridges-Batching Tolerances, HMAC Production and HMAC-Tolerances and Limits.  Dave McDonald was the superintendent.

79. In the summer of 2005, in approximately August, this project had failing volumetrics, gradations, and compaction.  QV3, QV4, and QV5 failed voids, specification 00745.16, HMAC.  QV3 and QV4 were reported at 6.1, but QV5 was reported at 6.3; but tolerance allows voids between 3.5 to 5.5.  QV5 reported failing the #200 sieve at 7.8; under specification 00745.14, HMAC, tolerance allows between 3.1 to 7.1.  Hooker Creek reported 6.4, a difference of 1.4; but tolerance allows +/-1.0.  Despite the failure of these verifications, and the substandard nature of the materials provided by Hooker Creek, the contractor received a bonus for its work on this project.

80.  In the same time period, on this project Hooker Creek colluded and conspired with ODOT officials to cover up its failure to adhere to contract requirements and to avoid alternative enforcement avenues.  For example, it failed to adhere to QA Program guidelines in connection with the QV4 density issues, and then agreed with ODOT personnel to avoid enforcement.  QAC Kirkland and QAE Mullis visited the project on 08/17/05 to run the density verification (QV4) on HMAC.  Density failed at 89.9%; specification requires 92%.  "Remarks"  denote how the QAC justified failing materials, stating: "Immediately began an investigation to determine reason for failing verification." The reason was never noted, however.  Only 4 locations were reported, but five readings are required.  It is not permissible to throw out low readings to achieve a passing reading, and calculations based on only four locations would be false.

81. Following the failure to adhere to guidelines on density testing, the QAC stated he took "other random locations and found passing test results at nearly each location." His report failed to list any testing results or locations, and did not describe the process by which "other random locations" were chosen. Such statements indicate obvious knowing non-compliance on behalf of Hooker Creek. Similarly, the size of the sampling area appears improper, as it is uncommonly small. Locations were within ¼ mile, but the actual testing area is grouped within 5/100th, or 1/20th, of a mile. This too indicates obvious knowing non-compliance with specifications.

82. On this project, Hooker Creek also colluded and conspired with staff from the Project Manager, fraudulently conferring substantial economic benefits to the ODOT inspector (Bruce Dunn) in exchange for an express or implicit promise not to require the contractor to rectify failed test areas. Said economic benefits included a free home driveway consisting of high quality materials which were supposed to be used on this project. This bribe was supplied to the inspector even while Hooker Creek used, on the project, substandard materials from a commercial source that were not tested for specification compliance. In an effort to cover up its fraudulent course of conduct, during investigation by Crook County District Attorney, the contractor falsely represented that dropping the materials at the inspector's house saved project money, in that it purportedly did not then have to drive excess material to a far away pit. Hooker Creek falsely represented it had brought the materials to the ODOT inspector's home over several days. Further, it falsely valued the materials supplied to the ODOT inspector at only $3,000. In fact, the materials were valued at about $20,000. In addition, the unlawful inducements provided including paving machines, rollers, workers and transport equipment, none of which is explained by the contractor's false claim it was merely disposing of "excess."

**Bend-Sisters Preservation project (Contract No. 13151)**

83. Hooker Creek was awarded a bid on the Bend-Sisters Preservation project (Contract No. 13151) on June 8, 2005, completing the project by April 11, 2007. This project was for paving Highway 20 and Highway 97 in and around Bend. Between the

award date and the Third Note date, Hooker Creek submitted bills for work and materials which the superintendent and quality control technicians knew or should have known violated specifications for HMAC Production QC/QA and HMAC-Tolerances and Limits.

84. Four out of five HMAC verification tests on this project failed.

a. Information from test-log reporting document, shows QV1 failed voids and VFA. Reported voids were 1.8; but allowable tolerance is 3.5 to 5.5.  VFA was reported at 88; allowable tolerance is 65 to 75.

b. A second QV1 was reported at 27.1% RAP; specification allows JMF +/-2.0; JMF is 25.  There was also reported failure on the #4 sieve of 64; allowable specification tolerance is 53 to 63.

c. QV4 failed voids with a reported 6.5; allowable tolerance is 3.5 to 5.5.  It also failed the #4 sieve with a reported 55; specification tolerance is 56 to 66.

d. QV5 failed dust-to-oil ratio; with a reported 1.62; allowable tolerance is 0.80 to 1.60.

85.  Defendant had actual knowledge of the failing materials supplied on this project, but nevertheless submitted claims for payment.  In addition, defendant was required to conduct its own Quality Control to ensure compliance with these material specifications.  It's failure to conduct or report such Quality Control measures, and its false reports of materials passing specifications, led to false and misleading statements on material contract terms.  Despite such failures, Hooker Creek was granted specials and cost increase requests on this project.

**OR 58: US 97 Overcrossing (Contract No. 13311)**

86.  Hooker Creek was a subcontractor on a contract awarded for the OR 58: US 97 Overcrossing (Contract No. 13311), with M. J. Hughes Construction Inc. as the prime contractor.  This project involved replacing an overpass on Highway 97's connection to Highway 58.  In April and May of 2007, Hooker Creek provided materials for the project in violation of contract specifications concerning Concrete Bridges-Batching Tolerances, as well as QA Program requirements for Base Aggregate, Subbase, and Shoulders.

87.  Project records demonstrate Hooker Creek created and used false and misleading records regarding base rock, in violation of base rock specifications (00641) and concrete bridges (00540).  On this project, there were obvious IA parameter problems with density, in relation to the use of statistical curves.   Notes by the contractor's technician report test data up until the final row of calculations; but only some of the data was actually reported.  Other data was omitted.  Remainders of the final test document varies from the scratch notes, evidencing that the data was manipulated to achieve an acceptable curve.  Contractor notes are used to carry data, and any scratch outs, additions, differences, missing numbers or other adjustments are suspected to be not actual numbers derived from testing.  Hooker Creek's records indicates intentional manipulation of the data, not math or recording errors.

88.  On 04/16/07, an IA curve for base rock was generated, out of IA parameters by 4 lbs. and 5% moisture.  On 05/03/07, a second attempt was made to try to settle the IA issue, but the difference was 3.1 lbs. and 3% moisture.  Under the QA Program, allowed tolerances are 3 lbs. and 2% respectively.  In addition, the QA technician used the second curve generated by Hooker Creek for acceptance.   This is not the appropriate method under the QA Program, and it precluded the documentation and disclosure of Hooker Creek's non-compliance.  If there is a discrepancy, the test results must be evaluated, and the QA Program is in place to verify the contractor.  Throwing out the QA curve and using the contractor's curve for verification does not meet this standard.

89.  On this project too, Hooker Creek agreed and colluded with ODOT officials in order to claim payment for non-compliant materials and avoid enforcement of contract remedies.  When QA Kirkland was questioned about these elements, he stated that he was told to disregard the QA curve and use the contractor's curve for verification.  Hooker Creek's collusion and agreements with ODOT personnel meant there was no independent assurance, in violation of specification 00641, base aggregate.

**US 97: China Hat Rd.-Baker Rd./Lava Butte project (Contract No. 13334)**

90.   Hooker Creek was awarded a bid on the US 97: China Hat Rd.-Baker Rd./Lava Butte project (Contract No. 13334) on March 9, 2007, completing the work on August 21, 2008.  This was a paving project between Bend and Sunriver, on the edge of Bend on Highway 97.  In approximately June of 2007, Hooker Creek provided materials it knew or should have known were in violation of procedures and specifications, including HMAC Production QC/QA.

91.   Hooker Creek's technician knew that the work failed specification on HMAC mix properties (00745), violated Manual of Field Test Procedures, and failed to follow test procedures TM 8 (in-place density of Bituminous mixes using the Nuclear Density Moisture Gauge) and TM 304 (Nuclear Density Moisture Gauge calibration and effect of hot Substrate).   Photographs of the gauge provided by relator shows the gauge used was not running correctly.  It had higher readings, making it easier for the contractor to achieve a compliance reading.  Paperwork shows three gauges (2 ODOT and 1 contractor) were not calibrated according to procedures, making it impossible to ascertain which, if any, were reading correctly.

92.   At the time Hooker Creek claimed payment on this contract, it knew that all compaction could not be verified.   Scratch notes provided for QV1 show that the technician did not follow TM 8.  This test method reads: "Note 4: If the difference between the two one minute tests is greater than 40 kg/m3 (2.5 lb/ft3), retest in both directions."  The hand notes show that the readings on #1 were exceeding their limits, with readings at 144.8 and 148.1, for a difference of 3.3 lbs.  The 144.8 was scratched out and a 146.5 was written in, denoting a second attempt was made in only one direction.  In the final paperwork, the 146.5 reading is used.  With reference to #3, readings were at 145.3 and 147.6, for a difference of 2.3 lbs.  The 145.3 was scratched out and a 148.2 was written in.  Only by changing these numbers was the reading well within tolerance.  Without following proper procedure for retesting, the readings were invalid.

93.  In the summary of test results on this project from June 11, 2007 to June 20, 2007, a chart shows IA parameters had issues and were not handled according to procedures of the QA Program (manual page 41, 42, & 47).  Proper handling of IA parameters being out of compliance requires that the sample be rerun and the numbers compared again.  In this instance, only half of the sample was rerun (ODOT's half).  The numbers from this retest were compared to the first set of test numbers from the contractor.  This is not in compliance with the program, as it is impossible to verify which of the samples were correct.

94.  Other false statements of compliance with specifications and fraudulent conduct connected with Quality Control and Quality assurance on this project include:

a.  Documentation sent to Ray Cunningham by Dave Kirkland, show the Job Mix Formula tolerance for asphalt content was incorrect.  Weights of biscuit for sample one and two are identical.  This is highly suspect for fraud.  In addition, the records are missing roller information.

b.  In the final attempt by Ray Cunningham to complete testing paperwork, a note refers back to page one hand notes.  This computer-generated document confirms that the invalid gauge readings were ultimately used to calculate the final document, using incorrect tolerances for the asphalt content.  In the final copy, one test result has been blacked out.  Relator tested the 'damaged biscuit".  There was a small notch out of one corner of the biscuit but the remainder of the biscuit was fully intact with no other markings or damage.  The density difference was only .015, well within the allowable Bulk Specific Gravity of IA parameters of 0.020.  The damaged biscuit was therefore testable.  Using this biscuit to calculate out voids however put the contractor out of specification on voids.  It is therefore clear the technician threw out the biscuit to avoid accurate, failing test results.

c.  QV4 (voids worksheet) is out of specification on voids and VFA.  Voids show 6.6; specification 00745.16 allows a tolerance of 3.5 to 5.5.  VFA shows 64; allowable tolerance is 65 to 75.

d.  QV2 (voids worksheet) is out of specification on voids and VFA.  Voids show 3.4: specification 00745.16 allows a tolerance of 3.5 to 5.5.  VFA shows 79; allowable tolerance is 65 to 75.

e.  QV3 is identical to the record listed as QV4.  This indicates a false or fraudulent duplication of verification test results.

f.  Standard Count Log shows no activity for 06/12/07 and 06/13/07.  The Standard Count Log readings must be listed when you use the gauge.  (TM 8)

g.  Hand notes from the QA department show there was a problem between ODOT's gauge and the contractor's gauge.  The maximum allowable difference between the gauges is 2.5 lbs.  In the records, the difference in the "OURS" verses "Carlson" columns is 4.7 lbs.  One of the gauges was out of calibration.  Proper procedure at this point required a determination of which gauge was operating correctly, using ODOT's Calibration Blocks.  This step was not performed correctly.   As a result, it was impossible to verify compliance with specification or adherence to QA procedure.

h.  A Nuclear Density Gauge Checkout Log shows that the gauge was used on 06/12/07 and 06/13/07.  This was a radiation license violation.

I.  The contractor's calibration check (hand notes) on Troxler gauge #25955 shows that only one standard count was taken.  Five are required for the test procedure. (TM 304)

j.  Hand notes written on 06/12/07 have numbers crossed out that were out of tolerance.  This scratch sheet was used to generate test records, and it appears this technician had a habit of re-shooting density readings to attain different numbers if the previous set of numbers are out of compliance.  These notes indicate that is what was done on this contract, as no test procedure allows for the reporting of multiple sets of numbers.  The contractor's conduct is strictly against procedure (QA Program, pg. 54 (#4), and ODOT TM 304, Section 5(G)).

k.  Nuclear Density gauge calibration records contain only one or no standard counts.  Standard counts orient the gauge to its environment.  Five are required under TM

304.  As a result, it was impossible to verify compliance with specification or adherence to QA procedure.

l.  QV3 (field worksheet) shows the same test number (QV3), using different dates and different data numbers.  This demonstrates that the tests in question were not actually the test for QV3. (00745)

m.  Comparison between the results of QV1 and QV1b demonstrate further falsehoods.  On the 3/8 and ¼ sieves, there is a difference of 10%; allowable IA tolerance is 5%.  The #4 sieve difference is 7%; allowable tolerance is 5%.  The #8 sieve difference is 6%; allowable tolerance is 4%.  The #30 sieve difference is 4%; allowable tolerance is 2%.  And the #200 sieve difference is 3.3%; allowable tolerance is 1.0%. [All of these tolerances are from the IA Parameters table (pg. 27) in the QA Program/MFTP.]

n.  Records comparing QV1, QV1?, and QV1b show all three versions, making it impossible to determine which in the actual version.  All tests were performed incorrectly.  This evidences that ODOT oversight was lacking, and that, pursuant to collusion and agreements with Hooker Creek, ODOT personnel were employing false and misleading numbers to try to verify a contractor's numbers. The test data that was generated from the QA group does not adequately explain why there is conflicting data, and therefore it is not possible to verify if the contractor achieved specification.

95.  Pursuant to collusion and agreements to take measures to protect against discovery of Hooker Creek's substandard materials, Hooker Creek arranged for ODOT personnel to shred failed ODOT QA documents.  Such fraudulent conduct was intended to preclude discovery of failed verifications, as well as Hooker Creek's demand for payment on contracts it knew it performed with non-compliant materials.

**US26: Warm Springs River project (13257)**

96.  Hooker Creek was awarded a bid on the US 26: Warm Springs River project (Contract No. 13257) on May 30, 2006.  This was an 11 mile project, from Mile Post 85 to approximately Mile Post 96 on Highway 26 (Warm Springs Reservation).   Between the start and the Third Note date (October 17, 2007), Hooker Creek submitted bills

causing the payment of more $3 million, knowing that the materials failed specifications. There were HMAC specification failures (00745). Test log reporting documents show QV1 out of specification on sieve #200. No numbers were reported on test data. Voids, VHA and dust-to-oil were out of specification. QV2 reported out of IA on the #200 sieve by 1.2%. Specification allows for tolerance of =/- 1.0 %. QV3 shows out of specification on voids. Reported number was 5.4%, tolerance is 3.0% to 5.0%.

**Oregon Mainline Paving, LLC**

**Redmond Reroute, Unit 1, Phase 2 project (Contract No. 13302)**

97.  Oregon Mainline Paving, LLC, was awarded a contract bid on the Redmond Reroute, Unit 1, Phase 2 project (Contract No. 13302), on or about December 5, 2006. This project was to construct a reroute on US97 Section of the Dalles-California Highway in Deschutes County. Defendant provided key foundational materials for the project, which in total required the expenditure of over $100 million. By completion of the project on or about November 24, 2009, Oregon Mainline had claimed, and caused the state to present claims for federal reimbursement, of more than $31 million for its paving, earthwork and related construction work and materials. Over $5.5 million of the project was scheduled for embankment in place. Throughout the time of this construction, Oregon Mainline submitted bills for work knowing it had violated standards and specifications for Earthwork, Base Aggregate, Compaction Requirements, Concrete Bridges Batching Tolerances, and Limits of Mixture. It also had many problems not adhering to the QA Program guidelines. Superintendent for defendant was Bob Peatrac, and additional contractor technicians who knew or should have known of the substandard work included Randy High and John Eells.

98.  Throughout the work on the project, defendant created false or misleading reports it had conducted the required Quality Control activities, and the materials provided had met specification. Defendant began earthwork Quality Control testing on February 5, 2007; by March 2, 2007, it claimed to have performed 64 QC tests. Each time, the contractor reported passing results. Quality Assurance testing began on

February 20, 2007. Two tests were performed (QV1 and QV2), and both failed. These failures required the contractor to generate new curves. On February 26, 2007, a technician from QA returned to the project to retest QV1 and QV2, and perform QV3 for the first time. The QV1 area was not reworked, as required by QA Program. QV2B and QV3 were performed, but QV2B failed again.

99. On February 27, 2007, the QC technician on the project falsely stated the Nuclear Moisture Density Gauge (Troxler) was not accurate in use on lightweight aggregate (cinders). He claimed to have a letter from the manufacture stating that the gauge was not guaranteed accurate on materials lighter than 90 lbs. per cubic foot. The contractor requested to discontinue use of the Nuclear Moisture Density Gauges altogether, and go to the deflection test method – an unreliable method to determine compaction. Materials being tested did not fit into the lightweight materials category of 90 lbs. or less, as the materials from the QC tests ranged from 93.6 lbs. to 109.6 lbs. Such heavy material was enough to achieve the required compaction readings via the Nuclear Moisture Density Gauge.

100. On February 28, 2007, a request was made for QV1B and QV2C be retested, and QV4 be performed (for the first time). All three test areas failed. QV1B required another curve. On March 5, 2007, QV1C was performed; and it failed. On information and belief, 8 Quality Assurance (QV) tests had been performed; with only one passing.

101. After producing approximately 70 Qaulity Control tests falsely reporting passing materials, Oregon Mainline continued working this project. Without accurate and truthful testing throughout the process, it is not possible to obtain verification of the quality of materials. After its false reports of passing tests, defendant continued to place lifts on top of prior lifts. At the time, it knew it was covering up failing materials, in the absence of passing Quality Assurance tests.

102. Relator raised concerns about the project on March 9, 2007, including the need for additional testing and the false or incorrect testing data. Oregon Mainline nevertheless continued to submit bills and received payment, ignoring these concerns.

103.  On March 19, 2007, relator performed QV5; it failed.  Interactions with the project manager, and the manager's response, evidence collusion between the contractor and the project manager, leading to an express or implied agreement to maintain good relationships by foregoing enforcement of contract requirements for compliance with specifications.  Rather than stop the construction, as outlined in specifications 00330 (earthwork) and the QA Program, the contractor sought a Contract Change Order on testing requirements, employing a method which does not permit materials verifications, and which is inappropriate for the circumstances.

104.  Even though 11 of 12 QV tests had failed on this project, defendant allowed failing materials to stay in place.  As a result, the roadway – designed by specification to have a projected 20-year life span – required major repairs before 5 years had passed.  In an effort to avoid detection, defendant continues to falsely claim said repairs were required for studded tire and truck damage, when, in fact, the roadway failed because it was on out of compliance on compaction.

105.  Another major problem with the project involves IA curve problems, in violation of the specification for earthwork (specification 00330).  On this project, IA did not match on the original curve between ODOT and the contractor.  With defendant's knowledge and agreement, the ODOT technician who generated the ODOT curve manipulated the numbers to make it appear that the curves matched.

106.  With respect to concrete bridges (specification 00541), between March 30 and July 27, 2007, there were six verification (QV) tests performed on the concrete placed on an overpass.  Not a single test passed specification (Section 00540.46B) for batching tolerances.  Five of the six tests failed QC responsibilities (Section 540.30B).  All of these specifications are Industry Standards, were material to the contractor's performance, and were not met.

107.  With respect to base aggregate (specification 00641), QV4 and QV5 failed gradation on the 3/8th sieve.  QV4 was reported at 77% and QV5 was reported at 76%; allowable tolerance is 55 to 75%  (Section 00641.10 and specification 02630). Section

00641.16 states that each sieve size needs to have a pay factor greater than 1.00.   With QV4 and QV5 failing, it was not possible for this to be attained.  The best possible pay factor is 0.97, rendering the stockpile to be non-specified.  Even though no payment should have been allowed for these materials under these circumstances, Oregon Mainline hauled the material out to the project and placed it on the ground.

108.   Records illustrate that, on this project, two original curves for QV on base rock were out of IA parameters, initially and upon retesting.  Even the curve produced in a 'third party resolution' was not used.  QA Program guidelines were not followed.  Further, with respect to HMAC (Section 00745), notes show that sieves were overloaded.  Instead of re-shaking the sample, as required per T 27/11, mathematical manipulation of the sample was used without physically performing the test.

109.  Photographs of this project also demonstrate substandard materials:

a. For QV1, photographs show the area to be exactly as it had been on the prior test date, even though the contractor claimed it was reworked and ready for re-testing;

b. For QV6, photographs show the ground as being dry, and roller tracks confirm that the ground is not yet fully compacted;

c. For QV7, photographs show the roller did not compact the ground clearly, as there are indentations from the sheep's-foot roller.  Also, the photographs show there are no large particles, in violation of the requirements for earthwork (specification 00330).

110.  Project Specials and emails from the Assistant Project Manager referencing form 4040 demonstrate awareness over relator's concerns and the failure to address them.  QA test for concrete bridges (specification 00540) show they were out of specification.  Spreadsheets contained out of specification concrete and a summary of specifications for failing earthwork.  Documents related to a Contract Change Order show elimination of testing on cinders.  All of these material violations were known to Oregon Mainline.

111.  Contractor's test results on this project falsely show passing QC.  These include: a spreadsheet summary of contractor's tests outlining failing areas; a curve chart and explanations related to base aggregate; information provided on March 5, 2007, to the

QA office dealing with earthwork (specification 00330); hand notes on the curve for earthwork (section 00330); QV9 through QV13, concerning earthwork and representing the area from station 5+860 to station 6+690, show five tests butted-up against one another; an email from the project manager's office shows the QA office used the incorrect base rock curve; hand notes of a Nuclear Moisture Density Gauge comparison, with ODOT's gauge showed a reading of 33kg/m3 higher than the contractor's gauge (allowable tolerance is 24kg/m3); a fax from Carlson Testing to Kirkland shows the contractor's awareness of lightweight density specifications from the Federal Highway Admin; an email from QAE Mullis explained he did not follow the QA Program; the contractor's QV1 curve shows the maximum density lower than what is actually achievable; QV1 and QV2, on base rock compaction, illustrate the QA technician used the incorrect curve.

112.  On this same project, in approximately February of 2007, Oregon Mainline Paving obtained documents from the test instrument manufacturer to support its claim that the equipment was not suitable for testing the type of materials on the project.  In order to obtain these documents, defendant misrepresented to the test instrument manufacturer the type of material to be tested.  The actual test data from both QC and QA verifies the material was in fact testable under both ODOT standards and the manufacturer's specifications for the testing instrument.  On the basis of defendant's false statements and fraudulent conduct, it received a Contract Change Order (CCO) from the Project Manager (Ron Snell) which altered testing requirements on fill material and set up specific guidelines for which materials fell under the new guidelines.  Even after the CCO was obtained, defendant knowingly failed to follow CCO guidelines.

**J.C. Compton Contractors**

**Biggs-Wasco & Grass Valley project (Contract No. 12907)**

113.  J.C. Compton Contractors was awarded a bid on the Biggs-Wasco & Grass Valley project (Contract No. 12907), on or about October 30, 2003.  This project involved realigning Highway 97, north of Wasco, and an over-lay between Biggs and Wasco.

Between the award date and the Third Note date of February 9, 2007, J.C. Compton had claimed more than $5 million for contract performance and materials on the project. At the time, the contractor knew or should have known that the work being performed was not in compliance with contract standards.

114. In February 2004, J.C. Compton determined to perform only 24 quality control tests, despite knowing that 2004 specifications required 53 such tests. J.C. Compton's records, and communications between technicians, the contractor and PM, would demonstrate how many were actually performed. Interactions between the project manager, QAE Mullis and relator indicate the contractor colluded with the project manager in an effort to create false documentation of passing verifications. Such actions were taken to enable contractor payments, even though the contractor had failed to fulfill its Quality Control and Quality Assurance obligations.

115. In this time period, defendant also knowingly violated specifications for HMAC Production, using a false record of passing results when three of four verifications failed. Records indicate QV1, QV2 and QV4 failures:

a. QV1 failed VFA with a reported 76; allowable tolerance is 65 to 75.

b. QV1 failed Density with a reported 96.7%; maximum allowable is 95%.

c. QV2 failed voids with a reported 6.2; allowable tolerance is 3.5 to 5.5.

d. QV2 failed VFA with a reported 60; allowable tolerance is 65 to 75.

e. QV2 failed dust to oil ratio with a reported 1.69; allowable tolerance is .80 to 1.60.

f. QV4 failed voids with a reported 2.5; allowable tolerance is 3.5 to 5.5.

g. QV4 failed VFA with a reported 81; allowable tolerance is 65 to 75.

h. QV4 failed dust to oil ratio with a reported 1.79; allowable tolerance is .80 to 1.60.

**Cotton Wood-Freemont project (Contract No.12985)**

116.  J.C. Compton was awarded a bid on the Cotton Wood-Freemont project (Contract No.12985), on or about April 7, 2004.   This was an over-lay project from north of Sunriver, to south of LaPine, on Highway 97.  Between the award date and the Third Note date of February 24, 2006, J.C. Compton claimed more than $4 million for work on the project, despite objective information that the materials provided did not comply with specifications. Superintendent was Mike Flanigan, Jr.

117.  Once finished, the project experienced severe failure of the HMAC in LaPine.  Shoving illustrates material is free moving, and not adhering to the under-layers of HMAC.  Defendant knowingly placed damaged mix on the project, using the windrow which was already in front of the paver during wet weather conditions.  Failure to use dry pavement was in violation of  specification. (Sections 00745.42 and 00745.48).

118. In the Fall of 2004, after being informed aggregate samples failed, J.C. Compton cherry-picked samples it knew would pass product compliance tests.  Defendant also submitted false Quality control documents in violation of specifications for HMAC Production QC/QA, falsely reflecting no problems with volumetric properties.  Defendant claimed and received a bonus on this project, knowing that it had provided a substandard product and was not entitled to any payment for the work performed.

119.  Use of substandard material on this project led to its premature failure. Failed highway surface on this project was removed and replaced approximately one month after completion.  Within approximately one year of the replacement, the highway surface began shoving again, in the same vicinity as the previous failure.  Relator performed a 'coring' mission to try to ascertain what was causing the failure.  The failing area was described as "migrating."

120.  One factor for the defective materials is the HMAC failed the dust-to-oil ratio.  Excess dust, considered contamination, (material smaller than the #200 sieve) causes the HMAC to be unstable.  These facts were omitted from the reports submitted for contract payment.  There are two failing verification (QV) tests, which well exceeded

the allowable tolerance of dust-to-oil.  QV1, dated 08/05/04, failed with a reported value 1.69; allowable tolerance is 0.80 to 1.60.  QV1, dated 08/30/04, failed with an extremely high 2.05; allowable tolerance is 0.80 to 1.60.  The sources (rock pits) of this HMAC had a history of excessive lightweight materials (cinder), which have a high absorption property, tending to soak up asphalt (oil).  Use of these materials were in violation of Section 00745.16 (dust-to-oil) and Section 00745.10 (light-weight pieces).

121.   Defendant J.C. Compton knew about these source issues, and the contractor was not comfortable using the Gas Station/Icehouse pit (09-099-4), requesting to only use the other source, Black Rock (18-100-4).  Photographs show the large amount of cinder included.  Such materials work well as long as they remain in a known consistency (cinder requires approximately 17% oil; hard rock requires only 5.5 to 6.5 % oil).  In this case, the percentage of cinder in the HMAC mix varied, making it next to impossible to regulate the oil and ensure an acceptable mix.

**Hap Taylor/Knife River**

**Grandview Dr.-Nels Anderson Place project (Contract No. 12884)**

122.   Hap Taylor/Knife River was awarded a bid on the Grandview Dr.-Nels Anderson Place project (Contract No. 12884), on or about August 8, 2003.  This project entailed building frontage roads along Highway 97 in Bend.  Between the award date and the Third Note date of June 24, 2005, defendant claimed about $1.17 million for work on the project.  At the time the work was performed, defendant's Superintendent and Quality Control technicians knew the work was not in compliance with specifications respecting HMAC-Compactors (00745), or acted with deliberate ignorance and reckless disregard as to the defendant's compliance.

123.   On or before April 1, 2004, Hap Taylor falsely report it had achieved the required compaction when defendant's technician used rollers that were smaller than specifications allowed.  Specification (Specials) 00745.24(a) states, "Provide steel-wheeled rollers with a minimum gross static mass as follows: Level 3/Breakdown and Intermediate - 9Mg."  Specification (Specials) 00745.24(b), vibratory rollers, refers

back to 00745(a) stating' "Have a minimum gross static mass meeting the requirements of 00745(a).  On QV1, rollers CB 334 and CB434 used smaller than specification requirements.  The CB 344 roller and the CB 434 roller have a minimum gross static mass weight of 3.96 Mg. and 7.40 Mg., respectively. This method took less compactive effort (weight) to achieve compaction, with the mix compacted too easily.  Defendant knew that it had problems with the volumetric properties of the HMAC, and yet falsely and fraudulently failed to report it.

124.  Specification 00745.49 requires: "Complete breakdown and intermediate compaction before the HMAC temperature drops below 180 degrees Fahrenheit…" There were no other rollers on the project, other than the ones listed herein. The fact that the HMAC achieved compaction with lower weight shows HMAC achieved compaction too easily, out of specification.   Further, actual material failed QV1 voids with a reported 3.8; allowable tolerance is 3.9 to 5.9.

125.  All of the substandard materials was known to the PQE (Pavement Quality Engineer) and the QAE, as well as ODOT QA Technician Steve Roberts.

**US 97: Riley Bridge Bend project (Contract No. 13032)**

126. Hap Taylor/Knife River was awarded a bid on the US 97: Riley Bridge Bend project (Contract No. 13032), on or about August 13, 2004.  This project involved replacing a bridge with a culvert, in side the city limits of Bend, on Highway 97. Between the award date and the Third Note date of January 17, 2007, defendant claimed $167,102 for work on the project.  Superintendent was Mike Hutchins.  At the time the work was performed, defendant knew or should have known that its work and materials violated specifications for Concrete Bridges-Batching Tolerances (specification 00540).

127.  Contrary to appropriate procedures, there was only one concrete verification test performed on this project.  It showed defendant did not meet batching requirements. It also showed plastic limits failed air percentage, with a reported 4.4; a minimum specification of 4.5 was required.  Tolerance is =/- 1.5 from a target of 6 (4.5 to 7.5).  A laboratory report available to defendant showed failure of air.

128. Defendant failed to document and disclose this non-compliance. In the Winter of 2004, in approximately November, this defendant failed to provide the required analysis, recommendations, and adjustments on this project. Moreover, it failed to submit required written reports in connection with changes in mix design.

**Or 16: Glacier-Highland Couplet project (Contract No. 13072)**

129. Hap Taylor/Knife River was awarded a bid on the Or 16: Glacier-Highland Couplet project (Contract No. 13072), on or about December 22, 2004. This was the first phase of the Redmond Reroute project, and included alignment of Highway 126 and Highway 97. Hap Taylor claimed just under $10 million for work on the project by its completion date of July 9, 2009. The project manager was Rob Peters At the time it performed its work and claimed payment, defendant knew that it had provided substandard materials in violation of specifications for HMAC-Compaction and while IA parameters were out of tolerance.

130. Defendant knew or should have known about the non-compliant materials provided on this project, and yet requested payments, including bonuses. Defendant colluded and agreed with the project manager to falsify compliance documentation. For example, QV1 for HMAC had a failing test report, showing 90.0%. With defendant's knowledge and agreement, the project manager falsely substituted a passing compaction number. As a result, the contractor was paid a bonus of $16,092.59.

131. In 2005 and 2006, defendant – through its QCT – falsely and fraudulently used a nuclear moisture density gauge owned by the defendant that was not in compliance with calibration standards. Defendant knowingly mis-calibrated the gauge in connection with its use. The Nuclear Compaction Test Report for HMAC (specification 00745) was performed to allow a bigger bonus, even though the original test failed for the area. Defendant colluded and agreed with ODOT QA Coordinator Dave Kirkland to mishandle the gauge, and defendant knew that Kirkland had a reputation for reporting false numbers in support of the contractor.

132.  In addition, records show the QAC and contractor did not match IA parameters, and had voids, dust-to-oil, and VFA specification failures.

a. QV4 (specification 00745, HMAC) reported voids at 2.6; allowable tolerance is 3.5 to 5.5.  VFA reported at 82; allowable tolerance is 65-75.

b. IA parameters are out of specification (AASHTO T 209).  Contractor reported a 2.554 verses ODOT reporting a 2.577, for a difference of .023; allowable is .020. ODOT performed another test, reporting 2.582, and calculated a difference at .028, which is also out of IA parameter, and by a larger margin.  Defendant's tester, Don Eves, admitted to relator he had been informed of these numbers, and questioned whether there may be "duplicate paperwork floating around," a reference to falsified documentation.

c. Verification test for QV4 (? -not specified) illustrates that compaction is being obtained too easily, especially when the finish roller did not meet weight requirements for the specification (00745, HMAC).

d. A memo to the file by the project manager inspector outlines that the contractor did not follow the QA Program.

133. On the same project, Hap Taylor  falsely and fraudulently used smaller rollers to achieve compaction in violation of HMAC-Compactors specifications.

**US 97/26 Willow Creek-Depoe Rd. project (Contract No. 13077)**

134.  Hap Taylor/Knife River was awarded a contract bid on the US 97/26 Willow Creek-Depoe Rd. project (Contract No. 13077), on or about December 22, 2004.  This project was the realignment of the intersection of Highways 97 and 26, at the north end of Madras.  A private consulting company acted in the capacity of the Project Manager. Defendant claimed more than $4.6 million for work on the project by its Third Note date of October 20, 2006.  At the time the work was performed and funds claimed, defendant knew or should have known it violated specifications for Concrete Bridges--Batching Tolerances, Aggregate Base, Subbase, and Shoulders.

135.  On this project, defendant knew or should about failures of specifications for concrete bridges (00540), base aggregate (00641), and HMAC (00745).  In addition,

documentation from region comparison of all concrete tests (Concrete Chart) performed in Region 4 over six years denotes material for this project failed batching tolerances. Defendant's own Quality Control obligations should have led to the documentation and disclosure of such non-compliance, but it failed to satisfy those duties.

136.  With respect to base aggregate, defendant failed to use a curve, and did not verify a base rock curve.  ODOT QAC performed QV1 on August 29, 2005, without the required curve information.   Test documentation, dated August 31, shows the curve number used to calculate results came from a different source.  On September 22, 2005, relator was instructed by the QAC to obtain QV2, even in the absence of curve information.  Tests showing passing density requirements were based on false numbers provided by QAC.  Relator recalculated after locating curve information worksheets, and found that the tests were not within IA parameters.

137.  Based on these records, the stockpile contained at least two different types of materials (rock).  Since no verification had ever been performed on the curves, it is impossible to determine which – if any – of the curve numbers were accurate, or whether the materials used match the correct density.  Despite its knowledge that verification would be precluded, defendant continued to perform the work, and demand payments.

138.  In addition, there were two required verification (QV) tests; both failed RAP content (00745.14).  QV1 was reported at 17.4 and QV 2 was reported at 17.3. Allowable tolerance for JMF is +/-2.0; JMF for this project was 20.  Photos for this project also show obvious non-compliant seams and segregation.  Despite its knowledge of these failures, defendant failed to accurately record them in its Quality Control, it continued to perform the work, and it continued to demand and receive payments.

**US 97: Redmond Reroute, Phase 1, Unit 1B (Contract No. 13165)**

139.  Hap Taylor/Knife River was awarded a bid on the US 97: Redmond Reroute, Phase 1, Unit 1B (Contract No. 13165), on or about July 6, 2005.   Up to the Third Note date of February 29, 2008, defendant claimed more than $6 million for work performed. At the time it performed the work, in approximately February of 2006, defendant knew

the project was in violation of specifications for Concrete Bridges--Batching Tolerances, and HMAC--Compactors (using smaller rollers).

140.  Defendant colluded and agreed with ODOT personnel in order to evade Quality Control and Quality Assurance reporting requirements, and to receive payment for work that was out of compliance with material specifications.  One ODOT technician falsely reported he was unable to drive a pin for verifications, and did not follow proper test procedures by moving to another area to continue with testing.  This is demonstrated by the fact that the report does not mention a change of test area, and station areas are measured and reported on the test form (00330 and AASHTO T 310).  Defendant's own records claimed it had driven testing pins on more than 60 occasions.

141.  All concrete for this project failed batching tolerances, Section 00540.46 – concrete bridges.  Such specifications are material to the roadway's compliance with the 20-year safety and durability mandate of the Transportation Act.

142.  Defendant used rollers on this project that were too small.  Per Section 00745.24 (HMAC), defendant was required to use a minimum weight for steel-wheeled rollers for finishing at 6-tons.  Rollers on the project weighed less than 5-tons.  The contractor achieved compaction of 95%; if the mix compacts at a lower weight, then the mix is too easy, and it will "shove" and "rut" under pressure of normal traffic.  The roller also did not make extra passes over the panel to achieve compaction, another indicator the mix properties were substandard.

143.  With defendant's knowledge and agreement, the QA technician generated an incorrect curve for use on this project.  Records demonstrate use of an incorrect curve for verification; while a hand drawn curve contained the correct version.  Such false records were used to cover up defendant's non-compliance with specifications, and to avoid contractual remedies that might be enforced against such non-compliance.

**OR 31: Silver Creek Bridge project (Contract No. 13185)**

144.  Hap Taylor/Knife River was a subcontractor on the OR 31: Silver Creek Bridge project (Contract No. 13185).  Steve Coats Construction served as the Prime

Contractor.   This project consisted of building a small bridge in Sliver Lake.  By 2006, defendant knew that the work it performed on the project had failures of specifications for earthwork (00330) and concrete bridges (00540).   Despite such knowledge, it submitted claims on the subcontract, in an amount to be determined, for such non-conforming work.

145.   On this project, defendant did not notify ODOT regarding the scheduling of the work.  As such, no density tests were performed on earthwork, and none were performed prior to completion of the work.  By delaying contact until after the work was done, the contractor purposefully foreclosed the possibility of verification.

146.   On this project, the QA verification test was out of specification for batching tolerances (00540).  Such specifications are material to the safety and durability of the bridge construction.

**US 97 @ S. Century Drive, Sunriver project (Contract No. 13189)**

147.   Hap Taylor/Knife River was awarded a bid on the US 97 @ S. Century Drive, Sunriver project (Contract No. 13189), on or about December 6, 2005.  This project was a large interchange at the entrance to Sunriver.  Defendant claimed more than $9 million for work on this project, which had a Third Note date of August 26, 2008.  By spring of 2006, defendant knew or should have known it was out of compliance on several material requirements, including specifications 00330 (earthwork), 00540 (base aggregate), 00641 (concrete bridges), and 00745 (HMAC).

148.   With respect to earthwork, several of the QV tests failed Section 00330.43, for density and moisture content, and deflection, including the first and second attempts. QV2B and QV8 (specification 00330, earthwork) documentation reflect the failures, but neither was included in the summary document, submitted as a condition of contractor payment.  Records at the time raised questions over the validity of the family of curves used on the project, but defendant failed to investigate or report those questions.

149.   With respect to concrete (specification 00540), all concrete tests failed batching tolerances, Section 00540.46.  The bridge deck failed on air content (Section 00541.17).  Reported air was 4.4%; specifications tolerance allows 4.5%.

150.  With respect to aggregate base, ODOT verified a curve that was within IA parameters, but this curve was not used.  Instead defendant generated another curve, which was not verified by ODOT QA, or any other entity.  This second, unapproved curve was the curve used to accept placement of base rock. By using either curve (approved or unapproved), the contractor was not placing the material at the proper moisture content, therefore the material failed 00641.12.

151.  With respect to HMAC, QV1 was out of parameters on the #200 sieve. Reported difference was 1.5; specification allows tolerance of +/-1.0 (QA Program, pg. 27).  In addition, records of the Project Manager QCCS demonstrate that samples had not been labeled in the field, in violation of standards (00596, MSE backfill).  Photographs of hand notes from ODOT technician Cunningham show original testing numbers crossed out, and higher numbers written in to the left.   This demonstrates numbers being written over (substituting a 9 for an 8), indicating the technician is 'auditioning' numbers to achieve a passing number, in violation of specification 00641, base aggregate.

**OR 126: Prineville Crooked River Bridge (Contract No. 13200)**

152.  Hap Taylor/Knife River was a subcontractor on the OR 126: Prineville Crooked River Bridge (Contract No. 13200).  JAL Construction Inc. served as the prime contractor.  This project involved a bridge replacement and an intersection change on Highway 126, at the intersection with Highway 26, at the west end of Prineville.  At the time defendant performed the work, it knew it had major problems with QA program, as well as failures of specifications for earthwork (00330), concrete bridges (00540) and HMAC (00745).  By 2006, defendant knew of these failures but nevertheless claimed payment of funds on the subcontracts.

153.  Although the contract required the addition of fly ash into the concrete mix, defendant produced the concrete without fly ash.  After this deficiency had been revealed to ODOT, defendant submitted a new mix design without fly ash.  Over half of the bridge was constructed with the improper mix, making proper verification impossible.  Even after the mix design changes, Hap Taylor produced concrete out of batching tolerances.

## SPECIFICATIONS AND CONTRACTS

154.  The following is a list of several of the specifications which defendants have knowingly violated in the performance of their work and provision of materials on federally funded projects.  Specification number refers to Oregon Standard Specifications for Construction (2002):

| Section | Title |
|---------|-------|
| **00330** | **– Earthwork** |
| 00330.17 | Quality Control |
| 00330.41 | Excavations |
| 00330.42 | Embankment, Fills and Backfills |
| 00330.43 | Earthwork Compaction Requirements: |
| **00540 – Concrete Bridges** | |
| 00540.10 | General |
| 00540.13 | Concrete Mix Designs |
| 00540.14 | Concrete Mix Tolerances and Limits |
| 00540.16 | Quality Control |
| 00540.17 | Acceptance of Concrete |
| 00540.20 | Batch Plant |
| 00540.30 | Quality Control Personnel |
| 00540.46 | Handling, Measuring and Batching of Materials: |
| 00540.47 | Mixing and Transporting Concrete: |
| **00641 - Aggregate Subbase, Base, and Shoulders** | |
| 00641.10 | General |
| 00641.12 | Limits of Mixture |
| 00641.15 | Quality Control: |
| 00641.16 | Acceptance of Aggregates |
| 00641.44 | Shaping and Compacting |

**00745 - Hot Mixed Asphalt Concrete (HMAC)**

00745.10      Aggregate

00745.11      Asphalt Cement, Additives and Aggregate Treatment

00745.13      Job Mix Formula (JMF) Requirements

00745.14      Tolerances and Limits

00745.16      HMAC Production QC/QA

00745.24      Compactors

00745.49      Compaction, QC

00745.61      Longitudinal Joints

00745.62      Transverse Joints:

00745.70      Pavement Smoothness

155. The following chart refers to contract numbers, dates, project names, contractor and amounts of the Prime Contracts set forth as individual claims against defendants.

| ODOT Contract | Federal Contract/Date | Project Name/Identifier | Contractor/Amt. |
|---|---|---|---|
| 13334 | X-NH-STP-S004 (104) 2/22/2007 | US97: China Hat Rd-Baker Rd./Lava Butte | Hooker Creek Asphalt & Paving **$4,170,000.00** |
| 13302 | OTIA-HPP-S004(093) 11/16/2006 | Redmond Reroute Unit 1, Phase 2 | Oregon Mainline Paving, LLC **$24,559,555.55** |
| 13189 | FH-NH-S004(089) 11/10/2005 | US 97 @ S.Century Drive, Sunriver | Hap Taylor **$8,272,669.00** |
| 13165 | OTIA-S004(086) 6/23/2005 | US 97: Redmond Reroute, Phase 1, Unit 1 B | Hap Taylor **$5,795,637.61** |
| 13151 | X-NH-S000-(255) 5/26/2005 | Bend-Sisters Preservation | Hooker Creek Asphalt & Paving **$2,274,496.50** |
| 13137 | X-NH-S041(016) 4/28/2005 | US26: Laughlin Road to Marks Creek (Mix went to QCCSS' home) | Hooker Creek Asphalt & Paving **$3,195,486.42** |
| 13077 | OTIA-SO-S000(238) 12/9/2004 | US 97/26 Willow Creek - Depoe Rd | Hap Taylor **$3,698,752.48** |
| 13072 | OTIA-S0-S015(023) 12/9/2004 | OR 126: Glacier-Highland Couplet | Hap Taylor **$8,452,287.90** |

| 13032 | X-STP-S004(077)<br>7/22/2004 | US 97: Riley Bridge Bend #01679 | Hap Taylor<br>**$168,482.40** |
| 12985 | X-STP-S000(219)<br>3/25/2004 | Cotton Wood- Fremont | J.C. Compton Contractors, Inc.<br>**$4,092,280.60** |
| 12925 | OTIA-S370(001)<br>11/6/2003 | O'Neil Highway | Hooker Creek Asphalt & Paving<br>**$2,332,233.00** |
| 12924 | X-PLH-NH-S053(018)<br>10/23/2003 | US26: Badger Creek - Sidwalter Rd. | Hooker Creek Asphalt & Paving<br>**$1,115,511.00** |
| 12907 | HPP-NH-S042(15)<br>10/9/2003 | Biggs-Wasco & Grass Valley | J.C.Compton Contractor, Inc.<br>**$4,831,074.56** |
| 13257 | X-NH-SO53(021)<br>5/18/2006 | US 26: Warm Springs River - Warm Springs Grade | Hooker Creek Asphalt & Paving<br>**$2,649,966.00** |
| 12884 | X-NH-S004(66)<br>7/24/2003 | Grandview Dr.- Nels Anderson Place | Hap Taylor<br>**$ 1,207,864.47** |
| 12876 | X-NH-S004(70)<br>6/26/2003 | South Bend Weigh & Safety Station | Hooker Creek<br>**$ 909,909.00** |

## ADDITIONAL ALLEGATIONS OF SYSTEMIC VIOLATIONS

156.   Relator's use of representative examples in his Second Amended Complaint as the method for pleading a broad scheme of fraud, spanning more than 200 contracts, was found to be insufficient.  Pursuant to the Ninth Circuit's mandate – granting Perry a further opportunity to amend – relator alleges additional facts and circumstances not set forth in the Second Amended Complaint.  These additional allegations – considered by themselves and in the context of the individual claims – set forth the particulars of relator's claim that certain defendants engaged in a consistent course of fraudulent conduct, outside Region 4, where relator observed the conduct alleged herein.

157.   Relator's allegations of systemic violations other than the individual claims alleged are based on information and belief, and made against defendants Oregon Mainline/J.C. Compton and Hap Taylor/Knife River.  During the time periods relevant to the individual claims, defendants Oregon Mainline and J.C. Compton were related entities; and subsequent to that time period, Oregon Mainline acquired J.C. Compton.

Information about systemic violations involving Oregon Mainline is, and was, reasonably understood by relator to form the basis of allegations against J.C. Compton. For purposes of allegations of systemic acts, relator refers to both defendants together, as one entity.

158.  Relator's allegations of systemic violations by Hap Taylor/Knife River contain a caveat, in that some information leads relator to believe that at some point in time – after this litigation had been filed – this defendant may have taken appropriate actions to curb the systematic use of non-compliant materials on its highway projects. If that fact were established, relator's claim of systemic violations by Hap Taylor/Knife River defendants would be limited in time.

159.  In addition to the individual claims of False Claims Act violations stated herein, and pursuant to a corporate-wide scheme employed consistently throughout Oregon, defendants Oregon Mainline/J.C. Compton and Hap Taylor/Knife River engaged in falsities and fraudulent conduct on all, or nearly all, of their highway contracts, with respect to compliance with material specifications.

160. Said systemic conduct was, and is continuing to be, similar in type, nature, scope and effect as the facts and circumstances forming the individual claims raised herein. These actions occurred during the same or similar time period as the individual claims, and involved the same policies and procedures, specifications, and oversight mechanisms. There are overlapping personnel involved in defendants' projects throughout Oregon, and defendants Oregon Mainline/J.C. Compton and Hap Taylor/Knife River directed said actions from a centralized decision-making organization.

161.  Additional information upon which relator bases his allegations of systemic falsity and fraud pursuant to statewide scheme include:

a.  There was frequency and consistency in substandard materials, false reports and fraudulent conduct by these defendants witnessed by relator within Region 4. Individual claims do not appear to be isolated instances. As a matter of apparent company policy, defendants Oregon Mainline/J.C. Compton and Hap Taylor/Knife River employed falsities and fraudulent over its contracts for highway materials as its mode of business.

b. There was statewide consistency in failures of ODOT at oversight, not restricted to Region 4, over road construction contracts awarded to defendants Oregon Mainline/J.C. Compton and Hap Taylor/Knife River.  Relator's observations occurred during the verification process – by which ODOT is theoretically supposed to be spot-checking these defendants' ongoing Quality Control efforts.  Relator alleges the same types of oversight failures, in the same fashion which led to the circumstances stated as individual claims, occurred in Regions 1, 2, 3 & 5.

c. There was statewide consistency in the claiming of funds for non-compliant work on road contracts by Defendants Oregon Mainline/J.C. Compton and Hap Taylor/Knife River.   In Region 3, these defendants used similar tactics pursuant to the same scheme: paving over non-compliant materials to thwart oversight and contract remedies, and prevent the verification process.  In Region 5, technicians cherry-picked its testing and falsified results of passing materials, leading to payment to these defendants for substandard work.  Records from Regions 1 and 2 demonstrate the same type of ODOT collusion and substandard roadway materials exist in those regions.

d.  There is statewide consistency in the premature failure of roads and bridges, premature wear, excessively high safety concerns and repair and replacement costs.  Over the past decade, Oregon has slipped several steps in relation to highway performance, deficient bridges, total and maintenance disbursements, as well as other factors related to cost-effectiveness.  Oregon's performance in Region 4 appears better than performance in the other regions.  Given this, there is no reason to believe these defendants acted in other regions differently with respect to non-compliant roadway materials.

e.  Material falsities and the fraudulent conduct revealed in the individual claims against defendants Oregon Mainline/J.C. Compton and Hap Taylor/Knife River demonstrate a corporate culture that would lead to violations in other regions.  As one statement from the Office of Inspector General of the United States Department of Transportation indicates: "Most contract frauds are not isolated instances, but are part of a larger, corporate-wide pattern of misconduct."

## DAMAGES

162.  As set forth above, defendants, and each of them, repeatedly, knowingly, intentionally, systematically and consistently provided substandard workmanship and materials which did not conform to the requirements of the contract documents.

163.  Defendants, and each of them, repeatedly, knowingly, intentionally, systematically and consistently created or caused to be created false records, invoices, progress reports, data sheets and supporting documents, and certifications falsely representing that the work performed by defendants conformed to the requirements of the contract documents as mandated by the federal scheme.

164.  Defendants, and each of them, knew, understood and intended that ODOT would rely upon the billing, records and claims submitted by defendants in connection with FAHP projects in order to obtain reimbursement of the federal share of project costs, and would cause ODOT to present claims to federal officials for reimbursement. Defendants each further knew, understood and intended that federal officials would pay over to the state amounts based upon the defendants' billing, records and claims.

165. As alleged herein, the United States paid funds towards the highway construction projects upon which defendants submitted claims for payment.  The United States did not authorize the disbursement of said funds to purchase Oregon's highways, or to commit them to its exclusive use.  Instead, federal grant money and congressional appropriations were paid to Oregon for intangible benefits conferred on federal projects, interstate commerce and the general public.

166.  A central purpose of the regulatory scheme for highway construction is to ensure that public money expended on such vital infrastructure of Oregon's highways and bridges is used only on projects which meet the 20-year safety and durability federal mandate.  Defendants' failure to supply conforming materials, failure to conduct and truthfully report Quality Control, and fraudulent conduct on highway contracts, as alleged herein, deprived the United States of the entire value of its grants and appropriations, paid out on defendants' contracts.

167.  By making false statements and certifications as described herein, defendants caused the United States to pay funds on highway contracts.  Had defendants' false claims and statements and fraudulent conduct been known to the federal government, the United States would not have paid, and defendants would not have received, any federal highway funds.

## CLAIM FOR RELIEF

### False Claims Act -  31 U.S.C. § 3729

168.  Allegations in the preceding paragraphs are re-alleged as if fully set forth.

169.  Defendants' claims, bills, reports and statements as described herein made in connection with their requests and demands under contract to the state as a grantee were "claims" under the False Claims Act (31 U.S.C.§3729(b)(2)(A)(ii), former  §3729©) because the Government had agreed to reimburse the state for a portion of the money which defendants requested and demanded.

170.  Defendants' conduct as described herein caused false vouchers and verified cost schedules to be presented to an officer or employee of the United States Government for payment and approval, in violation of former §3729(a)(1) and current §3729(a)(1)(A).

171.  As set forth herein, defendants, and each of them, by and through their officers, agents, and employees, knowingly and intentionally made, used, or caused to be made or used, false statements and false records to obtain Government payment and cause Government reimbursement of false or fraudulent claims in violation of former §3729(a)(2) and current §3729(a)(1)(B).

172.  Defendants, and each of them, through each bill, invoice, statement or report described herein, knowingly and intentionally caused Oregon to submit false claims to the Government, in violation of the False Claims Act, and is liable for damages and penalties for each such violation.  *See, e.g.*, *United States v. Bornstein*, 423 U.S. 303 (1976).

173.  As set forth herein, defendants, and each of them, knowingly made false implied and express certifications of compliance with laws, regulations and specifications

in the performance of their work on highway contracts.  Federal statutes and regulations, including those cited herein, require compliance with such laws, regulations and specifications as a condition for payment and receipt of federal funds.  Defendants, and each of them, expressly and implicitly certified that they were in compliance with said laws, regulations and specifications, intending such false certifications to pass scrutiny and receive FAHP funds.

174.  As set forth herein, defendants, and each of them, engaged in a course of fraudulent conduct to induce the Government to pay money in violation of the Act.  Said conduct included falsified test results, certifications of compliance, progress reports and other records falsely representing the quality and character of the work and materials claimed.

175.  As set forth herein, defendants, and each of them, through their various officers, directors and/or employees, agreed and conspired to defraud and make false claims to the United States by using false statements and misrepresentations, for the purpose of obtaining payment by the State (including federal share reimbursement) and to avoid contract compliance mechanisms, including termination of the contract and debarment.  More specifically, defendants, and each of them, agreed and conspired with ODOT and project manager personnel, to permit the knowing, consistent and systemic false and fraudulent claims, as set forth herein, in violation of §3729(a)(1)©.

176.  Every referenced claim for payment, certificate of conformance, statement, record, test result or other document related to compliance with federal and state highway construction regulations was material to the Government's decision to pay federal funds.

177.  Every referenced claim for payment and every certificate of conformance or other document certifying compliance with federal and state highway construction regulations submitted by defendants to the United States regarding the highway contracts identified herein were knowingly false claims and/or false documents.

178.  Defendants acted with actual knowledge of, or in reckless disregard concerning, the falsity of their certifications, statements and claims for payment made in

connection with the FAHP projects, as described herein.  Defendants therefore knowingly violated the False Claims Act, as defined in 31 U.S.C. §3729(b).

179.  Defendants acted with specific intent to cause the state of Oregon to present false claims for federal reimbursement on the basis of their billings, claims, certifications and reports, as set forth herein.

180.  The United States Government has been damaged as a result of defendants' violation of the False Claims Act, in that it has paid amounts on each of the contracts, even though work on those contracts failed to meet contract requirements.   As such, the work was worthless in terms of statutory purpose, including third party benefits.  Had the true state of the facts been known to the Government, defendants would not have received any contract payments, and thus the amount of damage to the government is equal to or more than the amount of funds paid.

## PRAYER

WHEREFORE, Relator prays, on behalf of himself and the United States of America, for judgment against the defendants, and each of them,  as follows:

1.  Treble the amount of damage caused by the defendants as the result of their false statements and fraud in violation of the False Claims Act;

2.  A civil penalty in the amount of $5,500 to $11,500 for each violation of the False Claims Act;

3.  Prejudgment and post-judgment interest as allowed for by law;

4.  An award of Relator's share in the maximum amount allowed pursuant to 31 U.S.C. §3730(d) and/or other applicable provision of law;

5.  An award of relator's reasonable attorneys' fees, litigation expenses and court costs; and

6.  Such other and further relief as the Court determines is appropriate.


///

///

Respectfully submitted,

Dated: April 8, 2016

Jeremy L. Friedman
Law Office of Jeremy L. Friedman

Derek C. Johnson
Johnson, Clifton, Larson & Schaller, P.C.

By: /S/Jeremy L. Friedman
Jeremy L. Friedman

Attorneys for relator Michael Ray Perry